774 P.2d 1113 (1989)
96 Or.App. 528
OREGON MANAGEMENT AND ADVOCACY CENTER, Inc., Petitioner,
v.
MENTAL HEALTH DIVISION, Department of Human Resources, Respondent.
CA A44666.
Court of Appeals of Oregon.
Argued and Submitted September 21, 1988.
Decided May 10, 1989.
*1114 James M. Brown, Salem, argued the cause for petitioner. With him on the brief were Myron L. Enfield, and Enfield, Guimond & Brown, Salem.
Timothy A. Sylwester, Asst. Atty. Gen., Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Atty. Gen., and Virginia L. Linder, Sol. Gen., Salem.
*1115 Before RICHARDSON, P.J., and WARREN and DEITS, JJ.
DEITS, Judge.
Petitioner, Oregon Management and Advocacy Center (OMAC), a provider of mental health services, seeks review of a final order of a Mental Health Division (MHD) hearing officer. The order requires OMAC to reimburse MHD for overpayments in the amount of $43,752.99, suspends OMAC from participation in MHD's medical assistance program until that amount is repaid and imposes conditions for it to reestablish its participation in the program. We affirm.
Pursuant to ORS 430.610 to ORS 430.700, MHD provides community based mental health services. Generally, the agency contracts with local governments that either provide the services or subcontract with local private agencies for the services. OMAC is a local private agency that provides "semi-independent living services," a transition program for persons who are moving to independent living from residential care facilities for the mentally ill. Marion County entered an agreement with OMAC to begin providing the services in July, 1984.
MHD's program is funded by state general fund monies and Medicaid medical assistance program monies under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396a-1396i. At the beginning of the contract period, OMAC was paid from general fund monies. In January, 1985, the source of funding for patients of OMAC who were eligible for Title XIX was changed to Title XIX funds. OMAC was so advised and applied to MHD for a Medicaid vendor number, which was issued to it on January 16, 1985. OMAC was sent the number and the applicable administrative rules, specifically, OAR 461-13-005 through OAR 461-13-225, relating to the Medicaid assistance programs, OAR 309-13-000 through OAR 309-13-017, relating to Medicaid payment for community mental health services, and Title XIX billing and payment instructions.
The billing procedures under the Title XIX program were significantly different from those under the general fund program. Under the general fund program, OMAC did not have to bill for specific services but was paid a monthly stipend. However, in the Title XIX system, OMAC was required to submit monthly billings. The billing codes and definitions of services under the two programs were also different. Under Title XIX, OMAC was required to keep records of services provided in each case file. In addition, it was required to establish a program of utilization review, a process for random internal review of the agency's case files. OAR 309-13-005(6).
In December, 1985, MHD conducted a general review of services and billings by various service providers, including OMAC. It discovered that OMAC services and billings were unusually high. As a result, MHD conducted an audit, which revealed that there had been substantial overpayments to OMAC. MHD does not contend that OMAC knowingly or intentionally submitted false reimbursement requests. Rather, the overpayments apparently occurred because OMAC mischaracterized a number of the services as "individual therapy," which has a high reimbursement value. The services should have been "socialization" services, which have a much lower reimbursement value. The audit also disclosed that OMAC had not maintained adequate records and had not established the required "utilization review" process.
MHD determined that OMAC had received an overpayment of $43,752.99. On April 17, 1986, MHD sent a notice of sanction to OMAC, which contained the audit findings, including the amount of overpayment, and imposed additional conditions on OMAC's continued participation in MHD's medical assistance program. A contested case hearing was held before a MHD hearing officer, who issued an order upholding MHD's action.
OMAC's first assignment of error is that MHD does not have authority to decide the matter. OMAC argues that it had a contract with Marion County and that the *1116 county, not the state, is the true party in interest. However, even assuming that only the county could bring an action against OMAC for breach of contract, this is not a contract action. It is a regulatory proceeding brought to ensure that a user of federal funds complies with all requirements relating to the use of those funds. Under Title XIX, participating states must require providers receiving Medicaid funds to maintain adequate records and to make those records available to state and federal authorities. 42 U.S.C. § 1396a(a)(27). MHD is designated as the appropriate state agency to carry out that responsibility. ORS 430.140. In accordance with that designation, MHD has specific regulations requiring providers who receive Mediaid funds to maintain adequate records and authorizing MHD to proceed administratively when it determines that an overpayment of Medicaid funds had been made. Former OAR 309-13-005 and OAR 309-13-015. MHD has the requisite authority.
OMAC also argues that MHD lacks authority to impose the sanctions, because the only authority for them is in OAR 461-13-005 et seq., the rules of the Adult and Family Services Division (AFSD), not MHD and, under these rules, only the AFSD administrator may impose sanctions. OMAC argues that, in order to have the appropriate authority, MHD must rely on the provisions of OAR chapter 461 and that it cannot, because those rules were adopted by AFSD, not MHD, and because OAR 461-13-095 specifically provides:
"(Except as otherwise noted, imposition of sanctions will be at the discretion of the Administrator of the Adult and Family Services Division.)"
We conclude that MHD had the requisite authority. In addition to its own administrative rules that provide authority for it to act,[1] its own rules specifically adopt by reference the procedures in OAR chapter 461. Former OAR 309-13-005(7). In addition, the authority to impose sanctions and to recover overpayments in OAR chapter 461 is given to "the Division,"[2] which under OAR 461-13-005 includes AFSD, MHD and the Senior Services Division of the Oregon Department of Human Resources. Finally, not even the language of OAR 461-13-095, on which OMAC relies, compels the conclusion that only AFSD has the authority to act. The provision states that it applies "except as otherwise noted." Because other sections of OAR chapter 461 give MHD authority to impose sanctions, that section does not deprive MHD of authority.
OMAC also argues that the notice given was inadequate. Specifically, it contends that the notice of sanctions letter included only conclusions, did not inform OMAC of the laws or administrative rules authorizing the claim and was insufficient for it to prepare a defense or response. We disagree. The notice stated the authority for the action and gave a clear and detailed statement of the matters charged. The notice complied with both the notice requirements of OAR 461-13-095(3) and OAR 461-13-190(2), and with the requirements of ORS 183.415(2).
OMAC also contends that the hearings officer erred in overruling its objections to MHD's evidence concerning the amount of *1117 overpayment, which was based on a statistical sampling procedure. MHD's evidence of how it calculated the overpayment was that it reviewed randomly selected billings and payments during each of the fiscal years in question. The amount of overpayment for the sampled billings was then compared to the amount that should have been paid, and those numbers were extrapolated to the total number of billings for the applicable time period. The 1984-85 sample used 41 billings to determine the overpayments for 1,199 billings. In the sample $1,324.43 was paid, whereas $346.16 should have been paid. That amount was then extrapolated to the total billings, 1,199, and it was determined that $39,500.38 was paid out; the correct payment should have been $10,324.03, resulting in an overpayment of $29,176.35. The random sample for fiscal 1985-86 was 41 of 752 total billings. That sample resulted in a finding of $1,301.22 paid, when the correct billing should have been $494.89. That sample resulted in the conclusion that $23,523,14 was paid out, when the correct billing should have been $8,946.50, resulting in an overpayment of $14,576.64.
OMAC first argues that, before the statistical sampling method could be used, it had to have been adopted as an administrative rule.[3] However, MHD's method of calculation is not a "rule" under ORS 183.310(8). Rather, it is one method of quantifying data for evidentiary purposes. In the notice of sanctions, OMAC was informed of its right to dispute the allegations and its right to present its own evidence in rebuttal, using the same or different methods of calculation. The notice summarized the sampling method used to calculate the overpayment, and copies of the samples and extrapolations were attached. See Illinois Physicians Union v. Miller, 675 F.2d 151 (7th Cir.1982). The agency's method of calculation is not given any presumptive effect. The hearing officer could accept the evidence that he found most persuasive. OMAC had ample notice of the evidence and was given a reasonable opportunity to rebut it.
OMAC also argues that the statistical sampling used was not reliable. OMAC asserts that
"the sampling did not take into account gender of the individual receiving services, no effort was made to equalize services provided by different OMAC employees, it was not possible to determine whether all billings reviewed occurred within one month or were evenly distributed over six months, and it was not possible to determine whether or not some billings may have originated outside of the sample period of time."
However, OMAC does not explain how these omissions affected the accuracy of the survey. MHD presented two expert witnesses who testified that the method was a sound and commonly used procedure, that it was accurate and reliable when properly applied and that, in their opinions, MHD's data and conclusions derived by the method were correct and reasonably accurate.[4] They testified that the method was 95 percent accurate. Contrary to OMAC's assertion, evidence presented at an administrative hearing need not be 100 percent accurate but must be "of a type commonly relied upon by reasonably prudent persons in conduct of their serious affairs." ORS 183.450(1). The data is sufficiently accurate to meet that standard, particularly when it is recognized that the 5 percent margin of error could fall either in favor of or against OMAC. It is not inherently biased against OMAC.
*1118 OMAC's final assignment is that MHD did not meet its burden of proof. It basically reasserts the prior assignments of error and also argues that it did not make as many billing errors as MHD alleges because the services billed were actually provided. MHD's determination of the overpayment was supported by substantial evidence.
Affirmed.
NOTES
[1] Pursuant to ORS 430.140 and ORS 430.041, MHD adopted administrative rules, former OAR ch 309, div 13, to prescribe standards and procedures for Title XIX funds. The rules cited were repealed effective July 1, 1987, and were replaced by the rules now codified as OAR 309-16-000 et seq. Former OAR 309-13-005 prescribed the requirements for a "service provider," such as OMAC, to participate in the Title XIX program, which included maintenance of adequate records, performance of "utilization reviews" and compliance with MHD's rules and the "General Rules of the Administrative Rules for Oregon Medical Assistance Programs published by AFSD." Former OAR 309-13-005(7) provided for sanctions to be imposed on a provider for abuse or misutilization of Title XIX funds and former OAR 309-13-015(4) provided for recapture of overpayment of Medicaid funds.
[2] OAR 461-13-095(1)(d) provides for sanctions by "the division" against providers who abuse or misuse Oregon's Medical Assistance Program. OAR 461-13-095(5)(g) provides for monetary sanctions against providers, and OAR 461-13-190(1) provides for recapture of overpayments to providers.
[3] On July 29, 1988, AFSD adopted a sampling method for use in calculations of medical provider overpayments, effective August 4, 1988. OAR 461-13-190.
[4] Other jurisdictions have come to the same conclusion. See Illinois Physicians Union v. Miller, 675 F.2d 151 (7th Cir.1982); State of Georgia v. Califano, 446 F. Supp. 404 (N.D.Ga. 1977); Meyers v. Ill. Dept. of Public Aid, 114 Ill. App.3d 288, 70 Ill.Dec. 175, 448 N.E.2d 1176 (1983); Quality Clinical Lab. v. Dept. of Social Services, 141 Mich. App. 597, 367 N.W.2d 390 (1985); Del Borrello v. Dept. of Public Welfare, 96 Pa. Cmwlth. 507, 508 A.2d 368 (1986), all approve the use of statistical sampling. Some courts have expressed a concern that a claimant must have an adequate opportunity to rebut the sample. However, OMAC had such an opportunity and did, in fact, present rebuttal evidence.